# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-02724-MSK-SKC

JASON KIRKLAND,

      **Plaintiff,**

v.

ROBERT W. BAIRD & CO., INCORPORATED,

      **Defendant.**

---

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT
## AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

---

      This matter comes before the Court on the Defendant's Motion for Summary Judgment on all of Plaintiff's claims **(# 56)**, Plaintiff's response **(# 61)**, and the Defendant's reply **(# 65)** and the Plaintiff's Motion for Summary Judgment on 4 of the Defendant's 6 counterclaims **(#55)**, the Defendant's response **(# 60)**, and the Plaintiff's reply **(# 64)**. Also pending is Plaintiff's Motion for Leave to File First Amended Complaint **(# 66)**, Defendant's response **(#67)**, and Plaintiff's reply **(# 68)**.

      The Plaintiff brings claims for breach of contract, violation of the Colorado Wage Claim Act, breach of implied covenant of good faith and fair dealing, promissory estoppel, and quantum meruit. The Defendant brings counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, and tortious interference with prospective business relations. **(# 3, # 23)**.

## JURISDICTION

The Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Sitting in diversity, this Court applies Colorado law to the parties' dispute.  *See Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864, 869 (10th Cir. 1993).

## FACTS

The Plaintiff, Jason Kirkland (hereafter, "Mr. Kirkland"), seeks to recover commissions from his former employer, the Defendant, Robert W. Baird & Co. (hereafter, "Baird").[1]  The Court summarizes the pertinent, undisputed facts here and elaborates as necessary in its analysis.

In March 2016, Baird hired Mr. Kirkland as a Senior Vice President of Experienced Advisor Recruiting.  In this position, Mr. Kirkland and his team recruited financial advisors ("recruits") for Baird.  Mr. Kirkland's job responsibilities were to build a recruiting pipeline and work with Baird's leadership and branch managers to increase the number of recruits hired at Baird.  **(# 56-2 at 25:14-28)**.  During the relevant time period, Mr. Kirkland was supervised by Katie Costigan, who reported to Erik Dahlberg, Executive Director of the Private Wealth Business Unit.

### The Employment Offer

On March 2, 2016, Mr. Kirkland signed an offer letter from Baird that contains agreed upon terms of Mr. Kirkland's employment and compensation structure (the "Offer"[2] ).  **(# 55-9 at 1-4)**.  At that time, the parties agreed that no other written agreements governing the terms of

---

[1]     Mr. Kirkland's third claim for relief was for discriminatory or unfair employment practices.  He now concedes that he failed to exhaust his administrative remedies with regard to this claim.  **(# 61 at 16)**.  Thus, it is **DISMISSED.**

[2]     Because the letter expressly states that it is not an "Employment Agreement", the Court will continue to refer to it as the Offer, with full recognition of that because Mr. Kirkland accepted the offer.

Mr. Kirkland's employment and compensation existed. However, subsequent to Mr. Kirkland's execution of the Offer, the parties modified its terms through their course of conduct.

The pertinent compensation provisions of the Offer follow:

## FINANCIAL TRANSITION PACKAGE

**Upfront Cash Component**
Upon joining Baird, you will receive a contingent upfront payment of $150,000, which will be advanced to you pursuant to the terms of a 9-year promissory note that must be signed by you and provided to Baird. Baird will forgive 1/108[th] percent of the principal amount, plus accrued interest thereon, on the 15th, or closest business day prior to the 15th day of each month that you continue to be an employee of Baird during the 9-year period. . . . You must repay the principal amount, plus accrued interest thereon, to Baird at the end of the term of the promissory note. However, if you remain employed by Baird under the terms of the promissory note and beyond the maturity date of the promissory note, you will owe nothing to Baird on this upfront payment.

## COMPENSATION PROGRAM

**Salary**
In 2016, you will receive an annualized salary of $125,000, prorated based upon the number of months you are employed by Baird, payable semi-monthly on the fifteenth and the last day of each month. In 2017, you will receive a base annual salary of $100,000, payable semi-monthly on the fifteenth and the last day of each month. Beginning in 2018, you will receive a draw of minimum wage at the time or recruiting commissions (as described below), whichever is higher, payable to you on the 15th day of each calendar month following your first month of employment during this period.

**Recruiting Commissions**
You will have the opportunity to earn commissions for the sourcing and placement of Experienced Financial Advisors (as defined in Baird's Financial Advisor Compensation Book), subject to any agreement that prohibits, limits or restricts your ability to recruit from certain geographical locations and/or former firms, as follows: 4% of the recruit's trailing 12 month production. As we have agreed to build out a sourcing team with two junior recruiters who will report to you, if a member of this team is responsible for helping you with the sourcing of an Experienced Financial Advisor, Baird will pay that team member 1% of the recruit's trailing 12 month production, in addition to the 4% to you, for a total of 5%.
. . .

**Non-Solicitation of Baird Employees and Consultants**
You agree that for a period of twelve (12) months immediately following the termination of your employment with Baird for any reason, you will not, directly or indirectly, on behalf of yourself or any other person or entity, solicit, induce, recruit or encourage any of Baird's employees or consultants, who became known to you or with whom you interacted during the period of his employment with Baird, to terminate or reduce their relationship with Baird.
. . .
This *offer is not an employment contract* or an agreement to employ you for a specified period of time or a promise of continued employment with Baird for any period whatsoever. Your employment with Baird shall be considered an "at will" arrangement and Baird may terminate your employment at any time for any reason. Any verbal modification to any compensation or benefits described in this offer shall have no force and effect. Baird has made no oral representations to you with respect to the terms of your employment which are not contained herein and you may not rely on any representations not set forth herein. (emphasis added) **(# 55-9 at 1-4)**.

**Modification by Course of Conduct**

Construing the evidence most favorably to Mr. Kirkland, it appears that despite

restrictions as to oral modifications to terms in the Offer, the parties modified the terms of Mr.

Kirkland's employment through their course of conduct. The modifications took several forms.

First, there were modifications related to Mr. Kirkland's compensation beginning in

2018. According to the Offer, beginning in 2018 Mr. Kirkland's compensation was to be based

only on commissions. He was unhappy with this, so the parties agreed that 1) that he would

execute a second promissory note in the amount of $50,000 and 2) his salary would continue until July 2018, after which he would be placed on a draw[3] of $100,000.[4]

Second, the Offer provided that Mr. Kirkland could earn the following commissions: 1) 4% of a recruit's trailing 12-month production for sourcing and placing experienced recruits at Baird **(# 55-9 at 1, # 56-2 at 101-102, # 56-5 at 58:19-24)**; and 2) a similar commission if a member of his recruiting team assisted with the sourcing and placing of a recruit. **(# 55-9 at 1, # 56-2 at 40-41)**. Outside of the Offer, however, Baird had a long standing arrangement whereby Mr. Kirkland was entitled to share a commission by agreement with a Baird branch manager if Mr. Kirkland or his staff assisted in hiring a recruit for the branch manager.[5] **(# 56-2 at 44-46)**.

---

[3] Ms. Costigan explained this as a "draw system" where Mr. Kirkland would receive a draw against earned commissions. **(# 56-2 at 38-39, # 56-4 at 41)**. When an individual is on a draw, his or her "income is going to come from . . . commissions, but those commissions can get paid at any point. And because they're sporadic, we give somebody a draw amount, in this case let's say $100,000 . . ., and that fronts them for the commissions that they're going to earn." **(# 56-4 at 43:7-13)**. In contrast, with a base salary, "there is no drawback." **(# 56-4 at 43:5)**.

[4] Based on Mr. Kirkland's financial concerns, Baird increased the draw amount from $47,500 to $100,000. **(# 56-4 at 42:1-23)**. However, Baird terminated Mr. Kirkland's employment effective August 2, 2018, and from July 1-August 2, 2018, Baird did not reduce Mr. Kirkland's draw by his commissions. Thus, he received the full amount of his $100,000 draw until his termination. **(# 56-4 at 198-199)**.

[5] Branch managers maintained their own recruiting pipeline for their branch and were typically given the opportunity to earn "2% of a recruit's trailing 12-month production in commissions at the 'front-end' (i.e., at the time the [financial advisor] starts with Baird), and then another 2% commissions at the 'back-end' (i.e., when/if the recruit achieved his/her trailing 12-month production as a [financial advisor] for Baird." **(# 56 ¶ 17, # 56-2 at 44-46, # 56-5 at 38:25-39:18)**. However, if a branch manager sought Mr. Kirkland's assistance with recruiting, the branch manager had discretion to share his or her portion of a 4% commission without approval from Baird leadership. **(# 56-2 at 46)**. In this instance, Mr. Kirkland was not responsible for sourcing the lead, thus he was not entitled to earn a 4% commission on the recruit. **(# 56-2 at 45-47, # 56-4 at 80-82)**. This type of arrangement was at the discretion of the branch managers and although Baird was aware of these situations, they were not subject to any approval by Baird leadership. **(# 56-2 at 45:18-47:3)**.

**Mr. Kirkland's Termination**

On August 2, 2018, Baird terminated Mr. Kirkland's employment.  There is no claim that the termination was unfounded or breached the terms of the parties' contract.  Indeed, with two exceptions[6], the circumstances leading up to the termination are not relevant to the claims or counterclaims in this action.[7]

The incident leading to the termination of Mr. Kirkland's employment that is pertinent to the counterclaims is that on July 25, 2018, Mr. Kirkland emailed a recruiting spreadsheet that

---

[6]     In addition to the exception discussed infra, Mr. Kirkland sought compensation from a branch manager during the time period in which Ms. Costigan and Mr. Dahlberg complained of his conduct.

[7]     In June 2018, Ms. Costigan and Mr. Dahlberg expressed concern with Mr. Kirkland's job performance, specifically his inflation of production numbers of potential recruits and "overreaching" for commissions with branch managers.  **(# 56-2 at 69-75)**.  Ms. Costigan and Mr. Dahlberg admonished Mr. Kirkland to act more like a business partner and be less focused on commissions when dealing with the branch managers.  **(# 56-2:9-12, # 56-4 at 116)**.

In July 2018, Mr. Kirkland was involved in a dispute with a branch manager over a commission payment.  **(# 56-2 at 102-107, 120:4-5, # 56-4 at 126-128)**.  Mr. Kirkland contended that he and Adam Persily, a branch manager in northern California, agreed to equally divide a 4% commission earned from the recruitment of Mark Fujiwara. **(# 56-2 at 90-92)**.  Then, Mr. Kirkland was notified that there was a mistake, that Mr. Kirkland would have to repay Baird the 1.5% commission he had received. **(# 56-2 at 102)**.  Ms. Costigan explained that because Mr. Kirkland was not involved in the sourcing of Mr. Fujiwara (as he and Mr. Persily were personal friends), Mr. Persily was only entitled to a 2% upfront commission rather than a 4% commission. Mr. Persily "was paid 2 percent, so he didn't have 2 percent to give [to Mr. Kirkland].  There was an extra 2 percent paid."  **(# 56-4 at 127:21-128:9-11)**.  Mr. Kirkland disputes this, contending that he assisted Mr. Persily recruit Mr. Fujiwara and was thus entitled to the full 2% pursuant to his agreement with Mr. Persily.  **(# 56-2 at 107:22-108:2)**.  Ultimately, Mr. Kirkland retained the disputed 1.5% commission.  **(# 56-2 at 216:15-21)**.

During this dispute, Baird contends that Mr. Kirkland made a false entry into Baird's Salesforce computer system.  **(# 56-4 at 134-136)**.  On July 9, 2018, Mr. Kirkland's Salesforce entry regarding the Fujiwara agreement read:  "I spoke with Adam about [Fujiwara] this morning.  Talks are starting to heat up with him and his partner Shawn Paschal."  **(# 56-11, #56-2 at 106-107)**.  On July 26, 2018, after Mr. Kirkland learned that Baird intended to recoup the 1.5%  commission, he added the following sentence to the Fujiwara entry: "I confirmed with him [Adam Persily] that he is still willing to do the 2 and 2 as well and he said of course why wouldn't he be."  **(# 56-11, #56-2 at 106-107)**.

contained the names and contact information for hundreds of potential recruits from his Baird email account to his personal email account.

Five days after his termination, Mr. Kirkland commenced employment as the Executive Director at AdvisorLaw where his job duties were to recruit financial advisors.

**This Action**

Mr. Kirkland brings five claims against Baird – all under Colorado law: (1) violation of the Colorado Wage Claim Act ("CWCA"); (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) promissory estoppel; and (5) quantum meruit. **(# 3)**.

Baird asserts six counterclaims arising under Colorado law: (1) breach of contract – failure to pay first promissory note; (2) breach of contract – failure to pay second promissory note; (3) breach of contract – wrongful taking of Baird information; (4) breach of contract – solicitation of Baird employees; (5) breach of implied covenant of good faith and fair dealing; and (6) tortious interference with prospective business relations. **(# 23-1)**.

Baird moves for summary judgment on all of Mr. Kirkland claims. Mr. Kirkland moves for partial summary judgment on Baird's third, fourth, fifth, and sixth counterclaims.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a prima facie case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig*., 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## DISCUSSION

### I.  Baird's Motion for Summary Judgment

#### A.  Breach of Contract Claim

For practical purposes, the Court begins with Baird's motion for summary judgment. Baird contends that Mr. Kirkland cannot make a prima facie showing on any of his claims.

Mr. Kirkland contends that Baird breached the terms of his Offer by refusing to pay commissions owed to him (1) for recruits he "unearthed" who were hired by Baird and (2) for a "pipeline" of leads that he created. In the course of discovery, Mr. Kirkland has identified those recruits for whom he believes he is owed a commission. Baird generally admits it has an obligation to pay Mr. Kirkland a commission for those recruits that he "unearthed" whom it hired, but with regard to the identified recruits, Baird contends that they were not "sourced and placed" by Mr. Kirkland as specified in the Offer. With regard to the pipeline, Baird contends it has no contractual obligation to pay.

To prove a breach of contract claim under Colorado law, Mr. Kirkland has the burden to show: (1) an enforceable contract; (2) that he performed his obligations under the contract or that he was excused from doing so; (3) that Baird failed to perform its obligations under the contract; and (4) that he suffered losses as a result of the defendant's non-performance. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted). Baird challenges only the showing for the second and third elements. To show a triable issue, Mr. Kirkland must come forward with evidence, that if true, would establish that he substantially performed his duties under the contract or that there existed some justifiable reason for him not to do so. *Id.* If he does so, his showing is sufficient for both elements 2 and 3 -- if he performed his duties, Baird must compensate him for that performance.

The parties acknowledge that the Offer contained terms governing Mr. Kirkland's employment, and that their course of conduct modified the Offer's terms. They disagree, however, as to some of the contract's terms.

The Offer states that Mr. Kirkland "will have the opportunity to earn commissions for the sourcing and placement of Experienced Financial Advisors (as defined in Baird's Financial Advisor Compensation Book)… as follows: 4% of the recruit's trailing 12 month production." **(# 55-9 at 1, emphasis added)**. Baird contends that certain recruits identified by Mr. Kirkland were not "sourced" and "placed" by him. Mr. Kirkland responds that that terms "sourcing" and "placement" as used in the Offer are ambiguous, and thus there is a triable issue of fact. This dispute raises the question of what the parties intended "sourcing" and "placement" to mean?

Under Colorado law, interpretation of a contract is a question of law for the Court to decide. *Ad Two, Inc. v. City and County of Denver, ex rel Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). In interpreting a contract, the Court must strive to give effect to the intent and

reasonable expectations of the parties to the contract. *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). In this regard, the Court first determines whether the language of the contract is ambiguous — that is, susceptible to more than one meaning. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993). The fact that the parties differ in their understanding of the contract does not create an ambiguity. *Federal Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013). The Court gives each word in the contract a plain and ordinary meaning, unless the contract evidences otherwise. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). The Court reads the contract as a whole and does not read its provisions in isolation. *Id.*

Under Colorado law, a meeting of the minds can be "evidenced through words or conduct." *Avemco Ins. Co. v. Northern Colorado Air Charter, Inc.*, 38 P.3d 555, 559 (Colo. 2002). "When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting." *CellportSystems, Inc. v. PeikerAcusticGMBH & Co.*, 762 F.3d 1016, 1035 (10th Cir. 2014) (citing *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313–14 (Colo.1984)). "This extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Id.*

The terms "sourcing" and "placement" are not defined in the Offer and the parties provide no definitions for these terms in other written documents. Mr. Kirkland argues that under the contract, he was owed a commission for locating ("sourcing") and "introduc[ing] a name of a potential recruit." ("placement"). **(# 61 at 13)**. Baird asserts that Mr. Kirkland must both discover a lead ("source") and the recruit must be hired by Baird ("placement"). **(# 65 at**

**2)**.  The distinction between the interpretations appears to focus on the meaning of the word, "placement" – that is whether it required hiring of the recruit introduced by Mr. Kirkland. Resolution of this ambiguity requires consideration of extrinsic evidence of the parties' intent.

Mr. Kirkland, Mr. Dahlberg, and Ms. Costigan each testified as to the meaning of the terms sourcing and placement.  Mr. Kirkland does not offer any testimony as to his interpretation of the term placement, only that sourcing included cold calling and courting.  **(# 56-2 at 44:20-22, 220)**.  Mr. Dahlberg understood sourcing included unearthing the initial lead or name of a recruit and that placement was synonymous with the hiring of the recruit.  **(# 56-5 at 51:9-16, 53:15-20, 104:9-10)**.  Ms. Costigan understood that sourcing meant that Mr. Kirkland had to surface a recruit who was otherwise unknown to Baird and that placement meant that the recruit was hired by Baird.  **(# 56-4 at 15-17, 77:1-4, 80:1-3, 83:12-13)**.  It is insufficient for Mr. Kirkland to rely upon his pleadings to create an issue of fact **(# 61)**, thus in the absence of evidence of a differing definition of placement, it appears that the parties agree to the definitions of "source" and "placement".  Source means the location or "unearthing" of a recruit; placement means hiring of the recruit.  Put simply, in order for Mr. Kirkland to be entitled to commissions for recruits, he must have located or "unearthed" the recruit, and the recruit had to have been hired by Baird.

With that understanding, the Court turns to Mr. Kirkland's claim that Baird breached the contract by not paying him commissions.  These claims fall into two categories: (1) recruits who

joined Baird and (2) a "pipeline" of leads he created during his employment. And as to the first category, Mr. Kirkland contends that he is owed commissions for 12 recruits.[8]

The parties appear to have a mistaken notion that by filing cross motions for summary judgment, the case can be tried "on paper". That is not the function of a motion for summary judgment, however. The purpose of a motion for summary judgment is to determine whether a trial is necessary – in essence, is there a genuine issue as to material fact. Here, Baird challenges whether Mr. Kirkland's breach of contract claim is adequately supported. In considering that challenge, Mr. Kirkland need only come forward with proof sufficient to show breach of contract in a single context in order to proceed to trial. Thus, the Court declines to consider the evidence with regard to the "pipeline" and every recruit.

The Court focuses on Nate Rumley. There is no dispute that Mr. Kirkland's team found ("sourced") him through a cold call and that he was hired by Baird ("placement"). **(# 56-2 at 220:16-25, # 56-6 at 99)**. However, according to Baird, "Mr. Rumley was terminated from his prior firm". For that reason, Baird refused to pay a referral bonus for a recruit that had been terminated. **(# 56-6 at 99-101)**. Although Baird argues that it does not pay commissions for recruits who were unemployed prior to joining Baird **(# 56 at 16),** neither the terms of the Offer nor any modification of its terms by course of conduct speak to such policy. It would appear that Mr. Rumley was "sourced" and "placed" by Mr. Kirkland according to the operative meaning of those terms, and that Baird has not paid the commission associated with Mr. Rumley's hiring.

---

[8]    (1) Nate Rumley; (2) Mark Fujiwara; (3) David Thuli; (4) Cathie Coleman; (5) Gerald Galbraith; (6) John Armistead; (7) John Bradley; (8) Aaron Campbell; (9) Patrick Beyerle; (10) Travis King; (11) Brian Rathbun; and (12) Anthony Schock. **(# 56-2 at 206:14-209:14)**.

Thus, Mr. Kirkland has made a prima facie showing of his breach of contract claim. It will proceed to trial.

**B.** **Colorado Wage Claim Act ("CWCA")**

Mr. Kirkland asserts that Baird violated the CWCA, Colo. Rev. Stat. § 8-4-101, et seq., by willfully refusing to pay the wages and compensation due and payable to him under the terms of his employment agreement. Baird moves for summary judgment on this claim, contending that Mr. Kirkland is not "eligible for, did not earn, and is not owed the post-termination commissions he seeks as a matter of law." **(# 56 at 14)**.

The CWCA "does not itself create any substantive right to compensation for labor and services performed. Rather, it establishes minimal requirements concerning when and how agreed compensation must be paid and provides remedies and penalties for an employer's noncompliance with those requirements." *Barnes v. Van Schaack Mortg., a Div. of Van Schaack & Co.*, 787 P.2d 207, 210 (Colo. App. 1990). It provides that "[w]hen an interruption in the employer-employee relationship by volition of the employer occurs, the wages or compensation for labor or service earned, vested, determinable, and unpaid at the time of such discharge is due and payable immediately." Colo. Rev. Stat. § 8-4-109(1)(a). The CWCA defines "wages or compensation" as:

> (I) All amounts for labor or service performed by employees, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculating the same or whether the labor or service is performed under contract, subcontract, partnership, subpartnership, station plan, or other agreement for the performance of labor or service if the labor or service to be paid for is performed personally by the person demanding payment. *No amount is considered to be wages or compensation until such amount is earned, vested, and determinable, at which time such amount shall be payable to the employee pursuant to this article.*

> (II) Bonuses or commissions earned for labor or services performed *in accordance with the terms of any agreement between an employer and employee*;
> . . .

Colo. Rev. Stat. § 8-4-101 (emphasis added). Also, the CWCA states that "[n]othing in [Colo. Rev. Stat. § 8-4-109(1)] shall . . . require the payment at the time employment is severed of compensation not yet fully earned under the compensation agreement between the employee and employer, whether written or oral." Colo. Rev. Stat. § 8-4-109(2).

In order to establish a violation of the CWCA, Mr. Kirkland must show he was owed commissions that were earned, vested, and determinable under the terms of the Offer and the parties' course of conduct at the time of his August 2, 2018 termination. *See Gomez v. Children's Hosp. Colorado*, No. 18-CV-00002-MEH, 2018 WL 3303306, at *6 (D. Colo. July 8, 2018) ("Colorado courts have specifically held that employment agreements define when benefits are earned, vested, and determinable."); *see Coldwell v. RITE Corp Envtl. Prop. Sols.*, No. 16-CV-01998-NYW, 2018 WL 5043904, at *5 (D. Colo. Oct. 17, 2018) ("Courts have held that for wages to be 'earned' or 'vested' under CWCA, they must be earned under the applicable employee agreement."); *Fang v. Showa Entetsu Co.*, 91 P.3d 419, 422 (Colo. App. 2003) ("For purposes of the CWCA, compensation is earned if it is vested pursuant to an employment agreement at the time of an employee's termination." (citations and quotation marks omitted)); *Barnes v. Van Schaack Mortgage,* 787 P.2d 207, 209 (Colo.App. 1990) (stating that the CWCA applies "only to compensation that has been earned under the employment agreement.").

The showing with regard to the first claim for breach of contract is sufficient for this claim. The Court appreciates that the CWCA claim may be duplicative of the breach of contract claim, and thus Mr. Kirkland may have to elect between them. This claim can proceed to trial.

**C.      Breach of the Implied Covenant of Good Faith and Fair Dealing**

In order to prove a violation of the implied covenant of good faith and fair dealing, Mr. Kirkland must come forward with evidence to establish: (1) the existence of a contract with a term that allowed for discretion by Baird; (2) performance by Mr. Kirkland; (3) Baird's failure to perform under the relevant term in a manner consistent with the parties' reasonable expectations; and (4) resulting damages to Mr. Kirkland.  *ConcealFab Corp. v. Sabre Industries, Inc.*, No. 15-cv-1793-CMA-KLM, 2019 WL 3282966, at *24 (D. Colo. July 22, 2019) (citing *Bolsa Resources, Inc. v. AGC Resource, Inc.*, No. 11-cv-01293, 2011 WL 6370409, *3 (D. Colo. Dec. 20, 2011) (citing *Western Distributing*, 841 P.2d at 1058)).

Although every type of contract in Colorado can include an implied covenant of good faith and fair dealing, *Spring Creek Explor. & Prod. Co. v. Hess Bakken Investment II, LLC*, 887 F.3d 1003, 1019 (10th Cir. 2018), the principle is invoked only when the contract gives one party the discretion to determine certain terms of the contract (often items such as quantity, price, or time).  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract.  *Id.*  The covenant exists to ensure that the parties' intentions and reasonable expectations regarding the contract are honored.  *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).

Mr. Kirkland contends that Baird breached its duty of good faith and fair dealing by not paying him owed commissions.  Such argument is misplaced because it is not grounded in an exercise of discretion anticipated in the contract's terms.  Because Mr. Kirkland, has failed to come forward with evidence sufficient to make a *prima facie* showing on this claim, Baird is entitled to summary judgment on it.

### D. Promissory Estoppel

To prove a claim for promissory estoppel, Mr. Kirkland must demonstrate: (1) a promise by Baird; (2) that Baird should have expected would induce Mr. Kirkland's reliance; (3) that Mr. Kirkland did, in fact, rely on that promise to his detriment; and (4) that the promise must be enforced in order to prevent injustice. *George v. Urban Settlement Services*, 833 F.3d 1242, 1257 (10th Cir. 2016). Under Colorado law, promissory estoppel functions in the **absence of a contract**, to enforce the "basic contract principle that one who makes promises must be required to keep them." *Id.* Promissory estoppel is "applicable only in the absence of an otherwise enforceable contract." *Scott Co. of Cal. v. MK–Ferguson Co.*, 832 P.2d 1000, 1003 (Colo.App. 1992) (overruled on other grounds by *Lewis v. Lewis*, 189 P.3d 1134, 1140 (Colo. 2008)); *Wheat Ridge Urban Renewal Auth v. Cornerstone Group XXII, LLC.*, 176 P.3d 737, 741 (Colo. 2007). "The alternative remedy of promissory estoppel is never reached when there has been mutual agreement by the parties on all essential terms of a contract." *Scott Co.*, 832 P.2d at 1003.

Mr. Kirkland contends Baird promised to compensate him for both his work in building the pipeline and for assisting branch managers recruit financial advisors. **(# 61)**. However, the terms of compensation were contained in the Offer and its modifications through its course of conduct. Mr. Kirkland does not identify any separate promise not covered by his contract with Baird. Because Mr. Kirkland, has failed to come forward with evidence sufficient to make a *prima facie* showing on this claim, Baird is entitled to summary judgment on it.

### E. Quantum Meruit

To establish a claim for quantum meruit under Colorado law, Mr. Kirkland must show: (1) Baird received a benefit, (2) at Mr. Kirkland's expense, and (3) that the circumstances would make it unjust for Baird to retain that benefit without paying. *Melat, Pressman & Higbie, LLP v.*

*Hannon Law Firm, LLC*, 287 P.3d 842, 847 (Colo. 2012). Mr. Kirkland contends he should be paid commissions for a pipeline of recruits and that it would be unjust for Baird to retain the benefit of the pipeline without compensating him. **(# 61)**.

As with promissory estoppel, the doctrine of quantum meruit is applicable when there is no contract between the parties. *Dudding v. Norton Frickey & Assoc.*, 11 P.3d 441, 444-445 (Colo. 2000). Here, to the extent that recruits were both "sourced" and hired, compensation is determined by the terms of the contract. To the extent that the "pipeline" of recruits includes those that were "sourced", but not hired by Baird, compensation is not governed by the contract, but under these circumstances, there is no showing of any benefit to Baird. In either circumstance, this claim is unsupported, and Baird is entitled to summary judgment.

## II.      Mr. Kirkland's Motion for Summary Judgment

Mr. Kirkland moves for partial summary judgment on Baird's third, fourth, fifth, and sixth counterclaims: breach of contract – wrongful taking of confidential information; breach of contract – solicitation of Baird Employees; breach of implied covenant of good faith and fair dealing; and tortious interference with prospective business relations. Mr. Kirkland argues Baird cannot make a *prima facie* showing as to the elements necessary to prove these counterclaims. **(# 55)**. In response, Baird contends there are genuine issues of fact precluding summary judgment. **(# 60)**. The Court addresses each counterclaim, in turn.

### A.      Breach of Contract Counterclaim – Wrongful Taking of Confidential Information

This and the following counterclaim are curious. Both are premised upon language found in the promissory note executed by Mr. Kirkland in accordance with the Offer. The note is unusual in that it contains more than an "unconditional promise to pay" a sum and provisions for

collection of such sum. It includes additional obligations and independent, even inconsistent

remedies. [9]

In this counterclaim, Baird claims that Mr. Kirkland breached the confidentially

provision in the first promissory note. It provides:

> 7. <u>Confidentiality.</u>    The Borrower recognizes and acknowledges that all records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, telephone numbers and financial information of any account, customer, client, customer lead or prospect of Baird ("Baird Clients"), are valuable and unique assets of Baird's business, constitute proprietary property owned exclusively by Baird, and shall remain the property of Baird at all times during the Borrower's employment with Baird and after termination of Borrower's employment for any reason with Baird. The Borrower agrees that all such records and information contained therein shall at all times be kept strictly confidential by the Borrower and that the Borrower shall not at any time during his/her employment or after termination of [his] employment for whatsoever reason . . . remove any such records from the premises of Baird, either in original form or in computerized, duplicated, or copied form except with the permission of an office manager for the purpose of conducting the business of Baird….The Borrower agrees not to divulge or disclose this information to any third party and under no circumstances with the Borrower reveal or permit this information to become known by any competitor of Baird either during his/her employment or any time thereafter. All of said records or any part of them are the sole proprietary information of Baird and shall be treated by the Borrower as confidential information of Baird.

**(# 55-2 ¶ 7)**.

---

[9]    It would appear that this contract language was grafted onto the promissory note without acknowledgement as to separate consideration, a severance provision, or language to address differing inconsistent remedies. For example, the obligation to pay is automatic with a confession of judgment. **(# 55-2 ¶ 3)**. Later, however, there is a mandatory arbitration clause that applies to "any action instituted as a result of any controversy or dispute arising out of this Note … ." **(# 55-2 ¶ 10)**. The parties do not address any of these anomalies, and the Court does not have the benefit of their argument as to interpretation of such an unusual document.

To the extent that the promissory note is treated as an integrated contract, then one would expect that Baird's claims for breach based on the Confidentiality and Solicitation provisions would be treated as a form of breach in the first counterclaim, rather than alleged in separate counterclaims. However, the parties have not addressed the issue, so the Court will assume that the parties prefer to proceed with each alleged breach individually.

There is no dispute that Mr. Kirkland executed the promissory note. There is no dispute that this provision is enforceable against Mr. Kirkland. The Court has previously set forth the elements that must be proven for a breach of contract claim, and incorporates such reasoning here. Mr. Kirkland contends that Baird has not made a sufficient showing that he breached this provision. The Court agrees.

It is undisputed that Mr. Kirkland emailed a recruiting spreadsheet to his personal email address on July 25, 2018, and that the spreadsheet contained information that arguably could be considered confidential. **(# 56-4 at 173)**. However, the confidentiality provision does not expressly prohibit this type of transmission. Rather, it prohibits removal of confidential information from Baird's control and disclosure of the confidential information to third parties. As to these two obligations, Baird presents no evidence of breach. At all times during his employment with Baird, Mr. Kirkland worked remotely from his home in Florissant, Colorado. **(# 55-9)**. Indeed, Baird does not rebut Mr. Kirkland's statement that he emailed the spreadsheet to his personal email address for the purpose of working on recruiting activities for Baird. **(# 61-5 at 169:14-19)**. Implicitly, that would mean that the transmission of information was within Baird's control and for its purposes. Similarly, Baird has not produced evidence showing that Mr. Kirkland disclosed the contents of the spreadsheet to a third person. Even construing the evidence of record most favorably to Baird, the Court cannot find that a reasonable jury could determine that the confidentiality provision of the first promissory note was breached. Accordingly, Mr. Kirkland is entitled to summary judgment on this counterclaim.

**B.      Breach of Contract Counterclaim – Solicitation of Baird Employees**

Baird also claims that Mr. Kirkland breached the terms of the provisions of the first promissory note obligating him not to solicit Baird employees. It provides:

20

8. <u>Non-Solicitation of Baird Clients and Employees.</u>   In addition to the foregoing, if, at any time, the Borrower resigns from Baird or his/her employment is terminated by Baird for any reason whatsoever . . . the Borrower . . . agrees that, while in the employ of Baird and for a period of one year after termination of his/her employment with Baird, the Borrower will neither confer nor discuss, either directly or indirectly, with any Baird employee, leaving the employ of Baird, nor confer or discuss, either directly or indirectly, with any Baird employee, employment by some other person or organization engaged as a broker/dealer in a related line of business.

**(# 55-2 ¶ 8)**.  In addition, the Offer contains a provision relating to solicitation of employees:

You agree that for a period of twelve (12) months immediately following the termination of your employment with Baird for any reason, you will not, directly or indirectly, on behalf of yourself or any other person or entity, solicit, induce, recruit or encourage any of Baird's employees or consultants, who became known to you or with whom you interacted during the period of his employment with Baird, to terminate or reduce their relationship with Baird.

**(# 55-9 at 2)**.

Baird contends that following his termination, Mr. Kirkland sent text messages to Baird employee, Kenzi Weidman, that attempted to discuss or solicit her employment on behalf of himself or his new employer, thus, violating the terms of the non-solicitation provisions.  But the only evidence of such communications is a text message that Mr. Kirkland sent to Ms. Weidman, a Baird employee, shortly after his termination from Baird and while he was working for Advisor Law: "Let me know if you run across guys that need some help getting their U4 cleaned up so you can get them hired.  I will even give you a referral fee.  I am down on Baird but I want to see you succeed."  **(# 60-8, # 60-4 at 154-156)**.

This communication does not solicit Ms. Weidman to "terminate or reduce" her relationship with Baird, nor does it suggest that anyone else leave Baird's employment.  Instead it seeks to help potential recruits be hired by Baird.  Thus, it is insufficient to prove breach of the

non-solicitation provisions.  Accordingly, Mr. Kirkland is entitled to summary judgment on this counterclaim.

### C.      Breach of Implied Covenant of Good Faith and Fair Dealing

The Court previously set forth the applicable legal standards for this claim and incorporates them by reference here.  Briefly, in order to prove a violation of the implied covenant of good faith and fair dealing, Baird must show: (1) the existence of a contract with a term that allowed for discretion on the part of Mr. Kirkland; (2) performance by Baird; (3) Mr. Kirkland's failure to perform under the relevant term in a manner consistent with the parties' reasonable expectations; and (4) resulting damages to Baird.  *ConcealFab Corp.*, 2019 WL 3282966, at *24.

Baird contends that Mr. Kirkland breached his duty of good faith and fair dealing in performing his contractual obligations by using his former position at Baird and "his prior access to Baird's confidential information to offer prospective Baird employees a behind the curtain look at Baird's business practices".  **(# 60 at 8)**.  Baird points to evidence that Mr. Kirkland contacted prospective Baird recruits (financial advisors with the firm J.J.B. Hilliard) via a LinkedIn message with purported "behind the curtain" knowledge based on his experience working at Baird.  **(# 60-4 at 185-188)**.  Mr. Kirkland then spoke to seven Hillard advisors who responded to the LinkedIn message.  **(#60-4 at 189)**.

As noted earlier, this type of claim applies in a narrow context – where one party to a contract has discretion to set the terms of the contract.  It is not a catchall claim used anytime a party to a contract believes that it has been treated unfairly.  The Court sees no application of this theory to facts that Baird offers.  Baird does not cite to any specific contractual term that allowed for Mr. Kirkland's discretion, nor his failure to perform under that term.  Thus, on this record,

the Court finds that no jury could find that Mr. Kirkland breached the covenant of good faith and fair dealing.  Accordingly, he is entitled to summary judgment on this claim.

>  **D.**　　**Tortious Interference with Prospective Business Relations**

"Colorado recognizes the tort of intentional interference with a prospective business relation." *Amoco Oil Co.*, 908 P.2d at 500.  In order to establish a claim for tortious interference with prospective business relations, a plaintiff must show the defendant engaged in (1) improper conduct with (2) the intention to induce or cause a third party not to enter into or continue business relations with the plaintiff, and (3) defendant prevented the contract formation.  *Id.*  The Court then focused upon the Restatement of Torts in determining whether a defendant acted improperly.  The factors are: (1) the nature of the conduct; (2) the motive; (3) the interests of the other individual which the defendant's conduct interferes, (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties.  *Id.* (citing Restatement [Second] of Torts § 766B).

Baird contends that Mr. Kirkland acted improperly when he made disparaging and false statements to prospective Baird recruits in an effort to discourage them from becoming Baird employees.  Mr. Kirkland moves for summary judgment asserting that Baird cannot prove elements 1 and 3 of its claim.

Following his termination, an associate at AdvisorLaw sent a message from Mr. Kirkland's LinkedIn account to 300 Hilliard financial advisors who were considering becoming Baird employees as part of a merger.  **(# 60-5 at 193-196, # 60-4 at 185-187).**  The LinkedIn message reads:

> Hi, until about 4-months ago, I was an SVP at Baird. In that role I became quite familiar with the firm. I would be glad to share my perspective if you are interested in a behind the curtain look. Moving your book is an important decision. An insider's experiences may be helpful. Call me . . . .

**(# 60-9).**  In response to the message, Mr. Kirkland was contacted by 7 Hilliard financial advisors, including Steve Golliher.  **(# 60-4 at 190)**.  Baird submitted a declaration of Mr. Golliher who stated that Mr. Kirkland made statements about Baird that made Mr. Golliher uncomfortable.  **(# 31-1)**.  For example, Mr. Golliher states Mr. Kirkland actively recruited him to leave Baird by informing him that he could "get more money if [he] transitioned out rather than accept Baird's retention offering."  **(# 31-1 at ¶ 10)**.  Mr. Kirkland also told Mr. Golliher that the "retention bonus Baird offered me was 'very weak' and that [he] could get a better deal elsewhere."  **(# 31-1 at ¶ 11)**.  Mr. Kirkland also disclosed to Mr. Golliher that Baird's business practices are generally more fee rather than transactional based and spoke poorly about how Baird treats its financial advisors.  **(# 31-1 at ¶¶ 12-13)**.  Mr. Kirkland called Mr. Dahlberg an "asshole" who made employees' lives a "living hell".  **(# 31-1 at ¶ 15)**.  Mr. Kirkland told Mr. Golliher that "he believed Mr. Dahlberg was likely to take over the Company soon, and that this change in leadership would likely end the Baird 'Brand.'"  **(# 31-1 at ¶ 16)**.

For purposes of analysis, the Court will assume that the statements that Mr. Kirkland purportedly made to Mr. Golliher were improper.  However, there is no evidence that these same statements were made to anyone else, and the Court cannot engage in speculation as to the content of other conversations that Mr. Kirkland had.  Mr. Golliher stated that he believed Mr. Kirkland's motive was to convince him to leave Baird, causing harm to Baird and allow Mr. Kirkland to recruit him to other firms.  **(# 31-1 ¶¶ 10, 18)**.  But apparently Mr. Kirkland's disparaging comments did not deter Mr. Golliher from transitioning from Hilliard to Baird  – or

put another way, Mr. Kirkland's statements did not prevent the formation of a contract between Mr. Golliher and Baird. Thus, no evidence has been presented that would be sufficient to satisfy the requirement of element 3.[10] Mr. Kirkland is entitled to summary judgment on this claim.

## III. Mr. Kirkland's Motion to Amend

Rule 15(a) (2) governs the amendment of pleadings and provides that leave to amend a pleading should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a) (2). Although leave under Rule 15 should be freely granted, the Court may deny such requests where the proposed amendment or supplementation is the result of undue delay, bad faith, a dilatory motive, where it would cause prejudice to the opposing party if granted, futility of amendment, or where previous efforts to amend failed to cure deficiencies. *Warnick v. Cooley*, 895 F.3d 746, 755 (10th Cir. 2018).

Mr. Kirkland seeks to amend his complaint to add a claim for wrongful termination in violation of public policy under Colorado law. There is no showing that the facts underlying such claim were newly discovered or that it could not have been asserted earlier in this litigation. Baird argues that motion should be denied as any amendment is untimely, futile, and unduly prejudicial. The Court agrees as to untimeliness and undue prejudice and does not reach the question of futility.

"Untimeliness in itself can be a sufficient reason to deny leave to amend, particularly when the movant provides no adequate explanation for the delay." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1495 (10th Cir. 1995). No finding of prejudice to the opposing party is

---

[10]  Indeed, Ms. Costigan testified in her deposition that she did not know how many Hilliard advisors elected not to transition to Baird based on Mr. Kirkland's LinkedIn message. **(# 60-5 at 196)**.

required.  *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991).  A court may properly refuse leave to amend if a party knows or should have known of the facts upon which the proposed amendment is based but does not include these facts in the original motion. *Minter v. Prime Equipment Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006); *State Distributing, Inc. v. Glenmore Distilleries Co*., 738 F.2d 405, 416 (10th Cir. 1984).  Further, Courts properly deny a motion to amend to "salvage a lost case by untimely suggestion of new theories of recovery." *Minter*, 451 F.3d at 1206.

Mr. Kirkland commenced this case on October 24, 2018, more than 16 months ago.  **(#3)**. Discovery closed on June 14, 2019.  **(# 49)**.  On August 30, 2019, cross motions for summary judgment were filed and later fully briefed.  **(# 55, # 56, # 60, # 61, # 64, and # 65)**.  Moreover, Mr. Kirkland admits he was aware of the facts giving rise to the new claim he wishes to add through the amended complaint well in advance of his motion and could have raised the wrongful termination claim in his original complaint.  He "discovered that the facts more accurately reflect a claim for wrongful termination rather than discriminatory practices, as originally alleged."  **(# 66 at 3)**.  Mr. Kirkland does not assert that he discovered <u>new</u> facts to support the new claim but rather that he should have framed them differently.  However, rather than raise this issue in June 2019 when discovery closed, Mr. Kirkland waited until Baird successfully demonstrated on summary judgment that Mr. Kirkland's discriminatory practices claim was not properly exhausted.

Further, this case is ready to be set for trial.  If the Court were to allow amendment at this juncture, it would be necessary to reopen discovery.  Although leave is to be freely granted to assure a party the opportunity to present a claim or defense, equal attention should be given to the proposition that there must be an end to a particular litigation.  *Pallottino v. City of Rio*

*Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994). Thus, the Court finds Mr. Kirkland's motion for leave to amend the complaint is untimely. *See Walker v. United Parcel Service, Inc.*, 240 P.3d 1268-69 (10th Cir. 2001) (district court did not abuse discretion in denying motion to amend where discovery was closed, the defendant had already moved for summary judgment, and alternatively, was ready for trial).

Under Rule 15(a), undue prejudice occurs when the amendment arises out of subject matter that is different from what was alleged in the original complaint and raises new theories and factual issues, affecting the defendant's ability to prepare a defense. *Minter*, 451 F.3d at 1208. Undue prejudice is the most important factor in deciding a motion to amend. *Id.* at 1207.

Although the amendment proposed by Mr. Kirkland does not assert any changes to the underlying facts, the elements of a wrongful discharge claim are quite different from the discriminatory or unfair employment practices claim pled in the original complaint.[11] Thus, the Court finds Mr. Kirkland's attempt to assert an alternate claim after conceding that his first claim was not exhausted and thus was barred, creates undue prejudice to Baird. Accordingly, Mr.

---

[11] Mr. Kirkland's prior claim for discriminatory or unfair practices rests on a theory that Baird terminated him for inquiring about his wages. **(# 3 at 8)**. For this claim, a plaintiff must show that he was "discharge[d], discipline[d], discriminate[d] against, coerce[d], intimidate[d], threaten[ed], or interfere[d] with . . . because the employee inquired about, disclosed, compared, or otherwise discussed the employee's wages." Colo. Rev. Stat. § 24-34-402(1)(i).

In contrast, for a claim for wrongful discharge in violation of public policy, a plaintiff must allege that he was discharged "(1) in retaliation for exercising a job-related right or performing a specific statutory duty, or (2) that the termination would undermine a clearly expressed public policy." *Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1184-85 (D.Colo. 2016) (citing *Underwood v. GEO Group, Inc*., No. 10–cv–306–LTB–KLM, 2011 WL 5593150, at *15 (D.Colo. 2011) (quoting *Kearl v. Portage Environmental, Inc*. 205 P.3d 496, 499 (Colo.App. 2008)).

Kirkland's motion for leave to amend his complaint is denied as both untimely and unduly prejudicial.[12]

## CONCLUSION

For the foregoing reasons,

1. Baird's Motion for Summary Judgment **(# 56)** is **GRANTED IN PART AND DENIED IN PART** as follows.  The motion is **GRANTED** as to Mr. Kirkland's claims of breach of implied covenant of good faith and fair dealing; promissory estoppel; and quantum meruit.  Summary Judgment is entered in favor of Baird on these claims.  The motion is **DENIED** as to Mr. Kirkland's breach of contract claim and violation of the CWCA. These two claims will proceed to trial.

2. Mr. Kirkland's Motion for Summary Judgment **(# 55)** is **GRANTED**.  Summary judgment shall enter in favor of Mr. Kirkland as to Baird's third, fourth, fifth, and sixth counterclaims.  Baird's first and second counterclaims will proceed to trial.

3. Mr. Kirkland's Motion for Leave to File First Amended Complaint **(# 66)** is **DENIED**.

4. Within 60 days of the date of this Order, the Parties shall engage in structured settlement negotiations with a private mediator, failing which they shall promptly request a settlement conference with the magistrate judge assigned to the matter.

5. Within 14 days after completion of settlement negotiations, if no settlement is reached, the parties shall jointly contact chambers to schedule the final pretrial conference.

---

[12] The Court need not reach the question of whether the proposed amendment is futile and expresses no opinion as to whether Mr. Kirkland's proposed Amended Complaint can state a claim for wrongful discharge.  However, the Court notes that the proposed amended claim **(# 66-1 at 8)** does not appear to identify a clearly expressed public policy or allege that such policy "truly impacts the public in order to justify interference into an employer's business decisions." *Kearl*, 205 P.3d at 499.

Dated this 25th day of March, 2020.

BY THE COURT:

Marcia S. Krieger
Senior United States District Judge